**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| JOSEPH ARCENEAUX, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-09-1554 |
| | § | |
| RICK THALER, | § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

Petitioner, Joseph Arceneaux, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging

a conviction in the 232nd Judicial District Court of Harris County, Texas. Respondent filed a motion

for summary judgment, (Docket Entry No. 6), and copies of the state court record. Arceneaux has

filed his response. (Docket Entry No. 7). After consideration of the motion and response, the record,

and applicable authorities, the court grants respondent's motion. The reasons for this ruling are

stated below.

## I.      Background

A jury found Arceneaux guilty of the felony offense of murder. (Cause Number 964048).

On February 21, 2005, the jury sentenced Arceneaux to thirty years imprisonment. The Fourteenth

Court of Appeals of Texas affirmed Arceneaux's conviction on August 15, 2006. *Arceneaux v. State,*

No. 14-05-00525-CR, 2006 WL 2345956, at *1 (Tex. App. -- Houston [14th Dist.] 2006, pet.

ref'd)(not designated for publication). The Texas Court of Criminal Appeals refused Arceneaux's

petition for discretionary review on January 10, 2007. Arceneaux filed an application for state

habeas corpus relief on November 13, 2007, which the Texas Court of Criminal Appeals denied

without written order, on findings of the trial court, without a hearing on February 11, 2009. *Ex parte Arceneaux,* Application No. 71,053-01 at cover.

With the assistance of counsel, Arceneaux filed this federal petition on May 21, 2009. Arceneaux contends that his conviction is void for the following reasons:

(1)     The prosecution withheld material impeachment evidence;

(2)     Trial counsel, John Parras,[1] rendered ineffective assistance by:

      a. failing to object to the use of the term "murder;"

      b. erroneously using the term "victim;" and

      c. opening the door to impeachment of his client; and

(3)     Appellate counsel, Hattie Sewell Shannon, rendered ineffective assistance by failing to challenge the factual sufficiency of evidence on the special issue of "sudden passion."

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, p. 2).

## II.     The Applicable Legal Standards

This court reviews Arceneaux's petition for writ of habeas corpus under the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).

Sections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an adjudication on the merits. An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).  A

---

[1]Parras is an associate with the law firm of De Guerin Dickson & Hennessy.

state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under section 2254(e)(1) unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)).  This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules.   Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party.   Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct.   *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

## III.   Statement of Facts

The appellate court summarized the evidence as follows:

> The tension between Terrence Wimbley ("Wimbley") and [Arceneaux] began one or two weeks before Wimbley's death, when the two men were involved in a fist fight at DT's, a pool hall. [Arceneaux]'s brother, Roy Arceneaux ("Roy"), had been gambling with three other men - Wimbley, "Nugget," and "Rick." Roy called [Arceneaux] and asked him to come to the pool hall. [Arceneaux] arrived with another friend, "Ced." [Arceneaux] bet with Wimbley on a game of pool between Roy and "Nugget." Roy lost, and [Arceneaux] paid Wimbley $50.00. [Arceneaux] testified Wimbley became angry after [Arceneaux] suggested he and Wimbley bet on a game between themselves. Roy testified Wimbley stood at the bar and "said several things" for about thirty minutes, threatening [Arceneaux]. Wimbley finally ran up like he was going to hit [Arceneaux], but [Arceneaux] hit Wimbley twice. Wimbley pulled out a knife, and then [Arceneaux] pulled out a knife. Roy broke up the fight, and Wimbley told [Arceneaux] he was going to "get his." Wimbley called his friend Ron Green ("Green"), who arrived shortly. Everyone but [Arceneaux] walked outside behind the pool hall, and Roy listened as Wimbley and Green talked; Roy felt tense at what they were saying. The group then walked to where [Arceneaux] stood with his cousin, Odrun Fontenot ("Fontenot"), in front of DT's.

[Arceneaux] asked Wimbley to "squash this" or, if Wimbley had a problem, to "go in the back and we can get it over with." [Arceneaux] testified Wimbley said he could not do that, and that Wimbley would "catch me like he want me." [Arceneaux] believed this meant Wimbley would get his revenge.

It was common knowledge around the neighborhood that [Arceneaux] had "punked" Wimbley at DT's. When asked whether Wimbley was upset about the rumors going around, Wimbley's friend Green testified, "Wouldn't you be?"

One or two weeks later, on October 4, 2003, [Arceneaux] and his cousin, Murphy Randall ("Randall"), went to a gun show, where Randall purchased a knife. Leundre Prescott invited [Arceneaux] to watch a Pay-Per-View boxing match between Evander Holyfield and James Toney that night at his grandmother, Vivian O'Quinn's, house. Ms. O'Quinn was away from home that evening.

[Arceneaux] arrived at Ms. O'Quinn's house at 7:00 p.m.; he had a 40-caliber, semi-automatic pistol concealed in his waistband.[FN1] Although [Arceneaux] testified he carried the gun because of Wimbley's threats, he also said he did not expect to see Wimbley that evening. There is evidence Randall brought the knife he purchased earlier that day.

> FN1. At least fourteen people were at Ms. O'Quinn's home that night: Novie O'Quinn (Ms. O'Quinn's son), Ron Green, Leosha Prescott, and Marcus Cambric (friends of Wimbley's), Leundre Prescott, Odrun Fontenot, and Murphy Randall (friends of [Arceneaux]'s), Kevin Wilson (who was described as "neutral"), two children - Marcus Cambric's son "little Marcus" and younger brother, T.J. - Kedrick Riley, and Terrence Porter. The Prescott brothers, Terrence Porter, and Kedrick Riley are Ms. O'Quinn's grandsons.

During the boxing match, [Arceneaux] and Green were the only people rooting for James Toney to win, and were high-fiving each other. When the fight was over, most people went outside, into the garage and driveway in front of the house.

 Ms. O'Quinn's home is positioned at the end of a cul-de-sac. The two-car garage has two large garage doors-only the right side door was open that night.[FN2] A small concrete walkway leads up from the

driveway to the front door of the house, to the right of the garage. There were four cars in the driveway on October 4th, including Kedrick Riley's work truck (parked at the top of the drive on the right-hand side, in front of the opened garage door). [Arceneaux]'s Ford Expedition was parked to the right of the driveway on the street, in front of Ms. O'Quinn's mailbox. Ron Green parked his car on the street to the left of the driveway. Leosha Prescott and Marcus Cambric parked their cars on the street around the cul-de-sac, one or two houses down from Ms. O'Quinn's. Wimbley arrived late and parked "caddy corner" at the end of the driveway, in front of and partially blocking [Arceneaux]'s Expedition.

> FN2. We refer to the right or left sides as they appear when facing the house from the street.

Ron Green, Leosha Prescott, Terrence Porter, and Kedrick Riley testified for the State. Green and Leosha Prescott admitted they had been Wimbley's friends. Riley met Wimbley in 1998. [Arceneaux] and his brother, Roy, testified for the defense.[FN3]

> FN3. Roy witnessed the events at DT's pool hall; he was not present at Ms. O'Quinn's on October 4th.

Leosha Prescott testified Wimbley arrived late, when it was already dark outside. Leosha Prescott said Wimbley was "his regular self," and he talked near his car for about twenty minutes. When Wimbley noticed [Arceneaux], he was "shocked." Wimbley appeared to be happy and said, "Whoa, today must be my birthday." [Arceneaux] testified he first noticed Wimbley when he heard the "birthday" comment, and he felt frightened when he heard this because of Wimbley's prior threats.[FN4]

> FN4. [Arceneaux] testified that, after the "birthday" comment, he saw Wimbley walk back and forth to his car and heard Wimbley "blurting out different things that we're not going to leave, that he should have been did this, took care of me and stopped me from coming around there." [Arceneaux] said he saw Wimbley put a gun in his waistband before he walked up to [Arceneaux], and that Wimbley was looking at [Arceneaux]'s waist area when he first approached [Arceneaux], apparently checking for a gun.

Wimbley approached [Arceneaux] at the "lip" of the garage and indicated he wanted to fight.[FN5] [Arceneaux], also known as "Tall Joe," stood about six inches taller than Wimbley. Green testified that the two men argued in a confrontational but moderate way: "It's not escalating where they hollering at the top of their lungs or you got to hold anybody back. They being men about it." [Arceneaux] testified he told Wimbley he "didn't come here for that," and he did not want any trouble. [Arceneaux] said Wimbley replied it was his lucky day, and "We're not leaving. You got your friends I got my friends." They stared at each other "eye to eye" for two or three seconds before Wimbley turned around and walked to his car.[FN6] [Arceneaux] said he saw Wimbley go to his car, put his gun on the passenger seat, and let the window down.[FN7] [Arceneaux] testified he overheard Wimbley on his cell phone saying "bring the AK I got a live one blocked in." [Arceneaux] said he asked, generally, to everyone present "please not to let this happen," and asked if someone could stop it, but that no one responded. Green testified he did not hear [Arceneaux] say this. The confrontation ended without incident, and everyone returned to what they had been doing. Wimbley and Green walked to the driveway and talked. [Arceneaux] went inside for about fifteen minutes.

> FN5. Green and Leosha Prescott both testified Wimbley emptied his pockets, took off his jewelry, and lifted his shirt to indicate he wanted to fight and was unarmed before first approaching [Arceneaux]. Green could not remember whether he ever told the police that Wimbley lifted his shirt, and Leosha Prescott stated he never told the police or prosecutors Wimbley picked up his shirt, even though he admitted this fact would be important to know.

> FN6. On cross-examination, [Arceneaux] explained he did not lift his shirt to show Wimbley his gun because that would have meant he wanted trouble.

> FN7. On cross-examination, [Arceneaux] testified he last saw the gun in Wimbley's waistband, and that he did not know for sure whether Wimbley put the gun in his car. Green testified [Arceneaux] was the only person that day with a gun.

[Arceneaux] testified that when he went inside, he told Leundre Prescott [FN8] that Wimbley had a gun and asked for help making Wimbley leave. [Arceneaux] asked not to let "this" happen here, at

Leundre's grandmother's house, and said he did not want any trouble, but Leundre did not respond. This made [Arceneaux] think he needed to leave. After ten or fifteen minutes inside, [Arceneaux] went outside and "it was just getting dark." [Arceneaux] stayed in the garage for ten or twelve minutes and decided to walk down the driveway toward his truck.

> FN8. Leundre Prescott, [Arceneaux]'s friend, was deceased at the time of this trial. His brother, Leosha Prescott, wore a shirt bearing Leundre Prescott's picture when he testified.

Green testified he stood in the center of the driveway between Riley's work truck and the car parked behind it, talking with Wimbley, who stood in the very center of the driveway. Riley testified Wimbley had his foot up on the bumper of the car parked in front of the closed garage door, on the left. Green said Fontenot ([Arceneaux]'s cousin) stood to his right. Green and Wimbley had talked for about thirty minutes when [Arceneaux] walked quickly down the middle of the driveway. Green said it looked as though [Arceneaux] was trying to get to his Expedition and leave. Green said he was surprised [Arceneaux] chose that route, because he was "coming right up" on Wimbley, and he could have walked around that area. [Arceneaux] testified he felt he could have taken no other path to his truck because there were people on the left and right sides of the driveway "scattered all around," including two friends of Wimbley's, Green and Marcus Cambric. Neither Green nor Wimbley moved out of [Arceneaux]'s way (when asked whether he got out of [Arceneaux]'s path, Green responded, "Why should I?"). What happened next was described in different ways at trial.

### *[Arceneaux]'s Account*

[Arceneaux] testified that, when he walked down the driveway to his car, Wimbley stepped out and held his arms open wide, holding a knife in his left hand. [Arceneaux] walked past, and Wimbley punched [Arceneaux] in the back of the head. [Arceneaux] stumbled forward and fell "right by the grass." When he turned over, Wimbley was standing over him and took a swing at [Arceneaux]. [Arceneaux] threw his hands up and Wimbley cut him on his right pinky finger. Wimbley was "still coming" at him with a knife, so he threw his legs up and was cut on the leg. Photographs and medical records show these cuts, and [Arceneaux] stated that, when he went to the hospital two days later, it was too late to get stitches in his leg.[FN9] [Arceneaux]

said he felt like his life was in danger. He reached for his gun and fired it once or twice toward Wimbley, who, once he noticed [Arceneaux] had a gun, started running between the cars. [Arceneaux] believed Wimbley was running toward his car, where [Arceneaux] had seen him put his gun earlier. [Arceneaux] got up from the ground and started toward his truck, but fell and scraped his knee. When he fell, [Arceneaux] looked to his right and saw Wimbley. [Arceneaux] believed Wimbley had made it to his car to retrieve his gun. [Arceneaux] fired one or two more shots in Wimbley's direction from [Arceneaux]'s position right in front of his Expedition. [Arceneaux] testified he never walked to where Wimbley fell; instead, he backed up and ran to his truck. Randall got in on the passenger side and he and [Arceneaux] drove away.

> FN9. Despite [Arceneaux]'s testimony that his stab wounds were bleeding, his blood was not found on the scene.

### Green's Account

Green testified that, when [Arceneaux] walked down the driveway, [Arceneaux] stopped in front of Wimbley and said, "What, bitch?" Wimbley hit [Arceneaux] and Randall jumped in, hitting Wimbley two or three times. Green testified [Arceneaux] and Wimbley started "tussling" and Green grabbed Randall by the back of his shirt and held his head down between his legs to keep him out of the fight. [Arceneaux] ran to the right, behind Riley's work truck, knocking down Green and Randall. By the time Green and Randall were on the ground, Green mostly heard what was going on around him. [Arceneaux] was "motioning" between the cars and Green testified that, when [Arceneaux] fell, Wimbley, sounding shocked, hollered, "Oh, ya'll trying to jump me," and started running in the opposite direction, across the driveway to the left of Ms. O'Quinn's house. Green said he thought the two-person fist fight had turned into a brawl. Green did not know why [Arceneaux] fell, but guessed Wimbley may have pushed him while trying to get away. According to Green, while Green and Randall were crouched on the ground, [Arceneaux] pulled out a gun and started firing from the grassy area to the right of the driveway, toward Wimbley. Green knew [Arceneaux] pulled a gun because he heard shots and felt gunpowder on his head. Once [Arceneaux] started shooting, Green ran up the driveway and tried to enter the house's front door, but could not open the burglar bars, so he ran into the garage. Green heard three shots. After [Arceneaux] shot "across the cars," [Arceneaux] started

motioning to the street. Green stood in the garage and watched [Arceneaux] "skip-walk" to the street: "by that time that's when I'm realizing [Wimbley] must be on the ground and [Arceneaux] fired two more shots in the ground." [Arceneaux] then walked backward to his Expedition, never taking his eyes off of the body. Randall jumped in the Expedition and they "burnt off down the street." Green walked to the street and saw Wimbley lying face down, not moving or breathing. Green walked back up the driveway and told Leosha Prescott to call the police.[FN10] Green left in Wimbley's car, explaining it was blocking his own car.[FN11] Everyone but Riley, Leundre Prescott, and Leosha Prescott left.

> FN10. Leosha Prescott testified Green made no such statement, and that he called for an ambulance on his own. Riley testified Green told Leosha Prescott to call "the laws." It is uncontradicted that no one cooperated with the police investigation that night.

> FN11. [Arceneaux] argues Green left in Wimbley's car to prevent law enforcement from locating Wimbley's weapon, and that the other State's witnesses (who were friends of Wimbley) did not admit to seeing Wimbley with a gun because there is "no doubt that they all wanted to help [Wimbley]."

### Kedrick Riley's Account

Kedrick Riley left and returned a few times during the evening. He returned just before the fight between Wimbley and [Arceneaux], and saw it from the end of the driveway.

Riley said [Arceneaux] stumbled backwards into the grass when Wimbley hit him. Randall charged at Wimbley, and Green grabbed Randall. That is when Wimbley yelled, "ya'all fend to jump me" and "the gun came out," causing Wimbley to "run for his life" in between the cars on the left side of the drive. Riley saw "fire" come out of the gun as [Arceneaux] shot. Riley never saw Wimbley on the right side of the drive, and never saw Wimbley come toward [Arceneaux]. He said Wimbley was eight feet away when [Arceneaux] pulled the gun out. Once the "shots rang out," Riley ran to the grassy area in the middle of the cul-de-sac. Riley saw Wimbley run to the left between the cars, through the neighbor's yard, and around the neighbor's mailbox - Wimbley did not run toward a car, he ran away from

[Arceneaux]. Wimbley fell in the grass [FN12] and did not move. Riley testified he did not see [Arceneaux] fall and hurt his knee.

> FN12. On cross examination, Riley testified Wimbley fell in the middle of the street.

[Arceneaux] "trotted" down the driveway after Wimbley, and Riley hid behind [Arceneaux]'s Expedition and "peeped" around the back of the truck. Riley saw [Arceneaux] "trot" or "skip, hop and jump" over to Wimbley. [Arceneaux] stood close enough to kick him, said "Like I told you bitch," and fired twice more before driving away. Riley went over to Wimbley, touched him, and said "you can wake up now." Green told Leosha Prescott to call the police. Riley admitted that, at the time, he was on probation for aggravated assault of a police officer and his probation was revoked for a "dirty" urinalysis after Wimbley's death. At the time of trial, Riley resided in a substance abuse facility.

### Terrence Porter's Account

Terrence Porter, who admitted to being a convicted felon, was playing a Matrix Revolutions video game in the garage when he heard gun shots. When he looked back, he saw [Arceneaux] standing in the middle of the driveway, shooting, and Wimbley running toward the street while [Arceneaux] followed. Porter said he ran into the house and threw up.[FN13]

> FN13. Porter's testimony contained several inconsistencies. Although Porter testified he only knew "of" [Arceneaux] and Wimbley, he also stated he knew Wimbley well. Although he testified there were "cars" in the driveway, he also said there was maybe only one car in the drive. He did not know whether there was a motorcycle at the house that day. Porter's testimony changed between "hearing" the first shots as he played his video game to "seeing" all five shots. Porter did not tell the police he saw who shot Wimbley until one week before trial, and admitted that he lied to the police at least four times. On cross-examination, defense counsel stated he noticed Porter looking at people seated in the front row in the courtroom. When asked if he knew anyone there, Porter said that he did not. When asked whether these people were Wimbley's family and friends, he answered they are, and admitted that he lied when he said he did not know them.

### Physical Evidence

Wimbley was found lying face down in the street to the left of Ms. O'Quinn's home. He had been shot three times: Once to the face, once to the lower back, and once in his left arm. No weapons were found on his body.

Police found three droplets of blood in front of Ms. O'Quinn's home belonging to Green.[FN14] Consistent with Green's account of where he walked after the shooting started, one droplet was in the walkway by Ms. O'Quinn's front door, one was in the center of the driveway close to the garage, and another was in the middle of the driveway, close to the street. Police did not find [Arceneaux]'s blood, although [Arceneaux] testified he bled when Wimbley cut him.

> FN14. Green was stabbed in the hand that evening; his hand bled heavily. Green believed Randall had a knife and that he was cut when he and Randall fell down in the driveway.

Police found a knife in the grass to the right of the driveway, close to the street. There was no blood on the knife. [Arceneaux]'s cell phone was found in the grass in the middle of the yard in front of Ms. O'Quinn's front door, to the right of the drive. Four bullet casings were recovered: One in the lower mid-section of the driveway near the street, one in the street by the driveway (near where Wimbley's car had been parked), one across the cul-de-sac that may have been kicked or moved by cars driving by, and another beside Wimbley's body. A fired bullet was recovered next to Wimbley's body, and bullet fragments were found in the street to the right of Wimbley's feet.[FN15] Video and photographs taken at the scene showed the only working light was across the street; it was very dark around Ms. O'Quinn's home.

> FN15. The shot to Wimbley's right cheek took a front-to-back, slightly downward path and lodged in his spine. A medical expert testified this shot would have paralyzed Wimbley immediately, and likely ended his life. "Impact abrasions" on Wimbley's face were consistent with that of an unbroken fall landing directly on the face; Wimbley had no abrasions on his palms. One bullet to Wimbley's left lower back traveled left-to-right and slightly upward and lodged in his spine; the wound was oval, indicating the bullet entered

the body at an angle. This shot would not have immediately immobilized Wimbley. One shot traveled through Wimbley's left arm above the elbow on a back-to-front, horizontal path. There was no stippling (abrasions caused by particles of unburned gun powder striking the skin around the bullet entrance wound) around any of the gunshot wounds, indicating the gun's barrel was more than two feet from the body when fired. An autopsy showed Wimbley had marijuana in his system when he died.

Two days after the shooting, on October 6, 2003, [Arceneaux] went to his attorney's office and then to the emergency room. He received treatment for a contusion to his head, cuts to his right little finger and right ankle, and abrasions on his right knee.

*Arceneaux v. State,* No. 14-05-00525-CR, 2006 WL 2345956, at *1-5 (Tex. App. -- Houston [14th Dist.] 2006, pet. ref'd)(not designated for publication).

## IV.   The Claim of Prosecutorial Misconduct Based on Failure to Disclose Favorable Evidence

Arceneaux complains that the prosecutor failed to disclose favorable evidence.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  *Banks v. Dretke,* 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland,* 373 U.S. 83, 87 (1963)).  The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused. *Banks v. Dretke,* 540 U.S. at 690 (quoting *Strickler v. Greene,* 527 U.S. 263, 280 (1999)); *United States v. Agurs,* 427 U.S. 97 (1976).  This duty applies to exculpatory and impeachment evidence. *Strickler v. Greene,* 527 U.S. at 280; *United States v. Bagley,* 473 U.S. 667, 676 (1985).

Undisclosed evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Wood v.*

*Bartholomew*, 516 U.S. 1, 5 (1995).  A reasonable probability of a different result is shown when

nondisclosure puts the case in a different light so as to undermine confidence in the jury verdict.

*Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).  "[I]nadmissible evidence may be material under

*Brady*." *Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996).  The key is "whether the

disclosure of the evidence would have created a reasonable probability that the result of the

proceeding would have been different."  *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999).

### A.    Ron Green

Arceneaux complains that the prosecutor failed to disclose evidence suggesting that State's

witness, Ron Green, was under a criminal investigation.  Arceneaux claims that had such evidence

been disclosed, he could have used it to impeach Ron Green.

The following exchange took place before trial:

> MR. PARRAS:  Lastly, Judge, I filed a Brady motion this morning.
> To a large extent we've -- I hear the State saying that she's never
> offered any of the witnesses any promises or agreements of leniency.
> My second request in the Brady motion however their chief witness
> guy named Ronald Green upon information and belief was named in
> an FBI wire tap.  In the affidavit for the FBI wire tap it's my
> understanding that Mr. Green was arrested by the Fort Bend County
> Narcotics Task Force on or about May of 02.  I've inquired with Fort
> Bend County as to whether or not any charges were filed and do not
> see any although the affidavit states that he was arrested with nine
> ounces of cocaine.  I'd like The Court to order the State to produce
> the offense report regarding that arrest so that I can review it for
> possible use in cross-examination.
>
> MS. JOHNSON:  Judge, all I can say on that is I had my investigator
> -- he made -- you know gave me notice of this a while back.  I did not
> even know about it.  I had my investigator look into it.  I've even
> asked the witness about it.  He doesn't know anything about it.  He
> said he was not arrested for anything back then and according to Fort
> Bend I can't find anything regarding this.  I mean we've looked.
> We've shown due diligence but I can have him look again but I've

had him look twice but it could be under some seal.  You know I've done all I can and it didn't result in any charge or conviction or anything.

MR. PARRAS:  May I hand to the Court for these purposes what I'm talking about?

THE COURT:  Yes.

MS. JOHNSON:  If he can lead us in the right direction we can take a look.

THE COURT:  Where does it say that he was arrested with nine ounces of cocaine?

MR. PARRAS:  One of those tabs I have Your Honor should say that.

THE COURT:  All right.  Well, you need to contact the Fort Bend County Narcotics Task Force and/or Bruce Denny at the Harris County Sheriffs Office and try to gather the information.

MS. JOHNSON:  Your Honor, just for the record Judge I've not been shown any of these documents up until today so you know had I had it ahead of time I could have attempted to produce them.

MS. NASSAR:  Certainly Mr. Parras has as much control over the Fort Bend County Sheriffs Department as we do.  Clearly he has more information than we have regarding this investigation and certainly has subpoena power to request people come to court or subpoena people to court regarding this.  We're happy to facilitate getting the information but I just want the record to be clear obviously at this point the Defense Counsel has the information.  It's not information that's in our control.

THE COURT:  Under Brady all the subdivisions of the state are treated the same.  You are responsible for other divisions.  I realize that's an unrealistic position but that's the prevailing law and I can't do anything about it.

MS. NASSAR:  We'll do everything we can to facilitate getting that information.

THE COURT:  I would appreciate it.

(Reporter's Record, Vol. III, pp. 8-11).

In his affidavit to the state habeas court, defense counsel testified as follows:

> My name is John Parras. I am an associate with the law firm of De Guerin Dickson & Hennessy, 1018 Preston, Seventh Floor, Houston, Texas 77002. I was lead counsel for Joseph Arceneaux at his murder trial in the 232nd District Court of Harris County in February of 2005. I am making this affidavit at the request of his habeas counsel, Randy Schaffer. Arceneaux was charged with a murder allegedly committed on October 4, 2003. Ron Green was the State's key witness. Prior to trial, I reviewed an affidavit in support of an application for a wiretap in an unrelated federal drug case which reflected that the Fort Bend County Narcotics Task Force found Green in possession of nine ounces of crack cocaine after he attempted to board a casino bus bound for Lake Charles, Louisiana, on May 3, 2002. Because there was no public record of a criminal charge, I suspected that he had entered into a contract with law enforcement authorities to work as a confidential informant in exchange for immunity from prosecution. As a result, I filed a *Brady* motion requesting information relevant to his bias or motive. The prosecutor responded on the record that neither she nor Green knew anything about this matter and that he had not been charged or convicted. She told the court that, if I would lead them "in the right direction," they would "take a look" at the situation. The court reminded her that the State was responsible to disclose information known to law enforcement agencies and instructed her to contact the Fort Bend County Narcotics Task Force and the Harris County Sheriff's Office. Thereafter, the State did not provide me with additional information about Green. I had no evidence to suggest that Green had a motive to testify favorably to the State as a result of any relationship with law enforcement or pending criminal investigation. Mr. Schaffer recently sent me a copy of an offense report that he found in the State's file in the Arceneaux case in May of 2007. It reflects that, on April 12,2004, Houston Police Department narcotics officers established surveillance on suspects who were about to purchase a large amount of crack cocaine; Green approached them with a bag, returned to his car, drove away, and the officers followed him. When he realized that he was being followed, he sped away, abandoned his car, and fled on foot. Although the report reflects that Green was arrested for evading arrest, there is no public record of a criminal charge. The State did not disclose this offense report to me nor was it in the State's file when I read the file. Had the State disclosed it, I would have requested further information

about whether Green was working as a confidential informant before, at the time of, or after the shooting. I would have elicited testimony suggesting that he was motivated to help the State because he was subject to prosecution for possession of cocaine and evading detention.  The presence of this offense report in the State's file when Mr. Schaffer reviewed it in 2007 indicates to me that the trial prosecutors had it during the Arceneaux trial, as they would have no reason to obtain it after the trial. Regardless, the report was available to them during the trial.

*Ex parte Arceneaux,* Application No. 71,053-01 at 41-43.

Kelli Johnson submitted an affidavit to the state habeas court in which she testified:

I am employed as an Assistant District Attorney with the Harris County District Attorney's Office, and have been so employed for over eight years. I was the lead prosecutor in the cases of *State of Texas v. Joseph Arceneaux,* cause number 964048. I have some independent recollection about the facts set forth in this affidavit, and I have also reviewed portions of the appellate record and the case file to help refresh my memory in giving this affidavit.

I have reviewed the portion of the appellate record containing my discussion at the bench during trial on February 15, 2005, with Judge Keel and defense counsel John Parras, about Ron Green's being named in an FBI application for wire tap and possibly being arrested in Fort Bend County on a narcotics charge. Mr. Parras had asked me about this matter well before trial. Based on my review of the original prosecution file, I believe I was already investigating the information provided by Mr. Parras as early as September 12, 2004. I asked at least one of our office investigators to try and locate any criminal information about Mr. Green, specifically following up on Mr. Parras' claims and including running a computer check on Mr. Green's complete criminal history. Also, we contacted the Fort Bend County Sheriff's Office to try and find additional information as to whether Mr. Green had ever been arrested or was the subject of any investigation.  Despite all of our efforts, we were unable to determine whether Mr. Green had ever been arrested on narcotics charges as alleged by Mr. Parras, nor were we able to obtain any additional information on him being named in a federal investigation. Furthermore, I questioned Mr. Green personally on several occasions about his knowledge of these matters - he denied ever being arrested in Fort Bend County on narcotics charges and denied any knowledge

> that he was the subject of an investigation. Having investigated Mr.
> Parras' claims and having relied upon other members of law
> enforcement to assist in that investigation, it was my good faith belief
> that no exculpatory information existed with respect to Mr. Green on
> these matters. I have seen the Houston Police Department (HPD)
> offense report naming Mr. Green as a suspect in a narcotics
> investigation and for evading arrest. I do not specifically recall seeing
> this report before trial or taking note that Mr. Green had been named
> as a suspect by HPD. I do not believe that I advised Mr. Parras that
> this report existed. Further, I do not know that Mr. Green was ever
> questioned or arrested before trial in connection with the HPD
> investigations for narcotics and evading arrest. Again, I asked Mr.
> Green on several occasions before trial if he had been arrested or
> charged, and he denied any knowledge of any narcotics investigation
> or of being arrested. In any event, I do not know of any agreement
> with Mr. Green by any member of law enforcement with respect to
> his testimony in Mr. Arceneaux's case. I never offered Mr. Green any
> consideration for his testimony in Mr. Arceneaux's case, nor do I
> have any reason to believe that Mr. Green was ever offered any
> consideration for his testimony by anyone else.

*Ex parte Arceneaux,* Application No. 71,053-01 at 267-268.

Denise Nassar Bradley submitted an affidavit to the state habeas court in which she testified:

> I am employed as an Assistant District Attorney with the Harris
> County District Attorney's Office, and have been so employed for
> over twenty-two years. I assisted Kelli Johnson in the prosecution of
> *State of Texas v. Joseph Arceneaux,* cause number 964048. I have
> some independent recollection about the facts set forth in this
> affidavit. I know that sometime prior to trial, defense counsel John
> Parras asked about the fact that witness Ron Green had been named
> in an FBI application for wire tap and was possibly arrested in Fort
> Bend County on a narcotics charge. Ms. Johnson primarily handled
> the investigation of that matter before trial and would be in a better
> position to answer questions on the matter. I assisted Ms. Johnson in
> trying to locate several witnesses just prior to trial, including Mr.
> Green. Based on my review of a portion of the original prosecution
> file, it appears that Mr. Green was named in a Houston Police
> Department (HPD) offense report as a suspect in a narcotics
> investigation and for evading arrest. I do not specifically recall seeing
> this report before trial or taking note that Mr. Green had been named
> as a suspect by HPD. I do not believe that I advised Mr. Parras that

this report existed. Further, I do not know whether or not Mr. Green was ever questioned or arrested before trial in connection with the HPD investigations for narcotics and evading arrest. I am not aware of any agreement with Mr. Green by any member of law enforcement with respect to his testimony in Mr. Arceneaux's case. I do not have any reason to believe that Mr. Green was ever offered any consideration for his testimony in Mr. Arceneaux's case. I know that Mr. Green was not offered any consideration in exchange for his testimony by Kelli Johnson or myself. I am also unaware of any member of the Harris County District Attorney's Office making any offers to Mr. Green in exchange for his testimony.

*Ex parte Arceneaux*, Application No. 71,053-01 at 262-263.

The state habeas court made the following findings of fact:

4.      Parras filed a Brady motion alleging that prosecution witness Ron Green was suspected by the Federal Bureau of Investigation of trafficking in large amounts of cocaine, that Green was a "named interceptee" in at least two affidavits for federal wiretaps, and that Green had been arrested in May 2002 by the Fort Bend County Narcotics Task Force for possessing nine ounces of crack cocaine. Parras asked the trial court to order the State to provide the offense report for the May 2002 arrest as well as material from the FBI regarding Green.

5.      Johnson assigned an investigator to follow up on Parras' claims of Green's criminal activity. He could not determine whether Green had ever been arrested on narcotics charges as alleged by Parras and was unable to obtain any additional information about Green being the subject of a federal investigation. Johnson questioned Green personally about his knowledge of the matters alleged by Parras, and Green denied ever being arrested in Fort Bend County on narcotics charges and denied knowing that he was the subject of an investigation. Johnson reasonably believed that no exculpatory information existed relative to these matters.

6.      Green was named as a suspect in an April 12, 2004 Houston Police Department offense report in connection with an investigation involving narcotics and evading arrest. This offense report appeared in the State's file at some point, but neither prosecutor remembers seeing it, and Parras did not see it.

> 7.      Green was not booked into the Harris County Jail between April 11, 2004, and February 22, 2005.
>
> 8.      There is no evidence of an agreement or consideration between Green and the State with respect to Green's testimony in applicant's case.

*Ex parte Arceneaux,* Application No. 71,053-01 at 299-300. The Texas Court of Criminal Appeals expressly based its denial of habeas relief on these findings. *Ex parte Arceneaux,* Application No. 71,053-01 at cover.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 mandates that federal courts give great deference, subject to limited exceptions, to the state courts' resolution of a petitioner's claims. *See Foster v. Quarterman,* 466 F.3d 359, 365 (5th Cir. 2006). This "deference is mandated both for questions of law and for mixed questions of law and fact." *Id.* The AEDPA increased the level of deference due to a state court's factual findings. *See Pondexter v. Dretke,* 346 F.3d 142, 149 n.9 (5th Cir. 2003); *but see Alexander v. Cockrell,* 294 F.3d 626, 630 (5th Cir. 2002) (stating, in a post-AEDPA case, that federal habeas courts "are required to accord a presumption of correctness to state court findings of fact, unless they lack fair support in the record"). This court must presume that the state court's factual findings are correct unless Arceneaux meets his "'burden of rebutting [that] presumption ... by clear and convincing evidence.'" *Foster,* 466 F.3d at 365 (quoting 28 U.S.C. § 2254(e)(1)) (alteration and omission in original). Arceneaux has failed to rebut the presumption of correctness.

The state habeas court made the following conclusions of law:

> 1.      Applicant fails to demonstrate that the State withheld favorable and material evidence in the primary case. *Brady v. Maryland,* 373 U.S. 83 (1963); *Ex parte Kimes ,* 872 S.W.2d 700, 703 (Tex. Crim. App. 1993).

2.     The April 12, 2004, HPD offense report was not admissible or material. *See Ex parte Kimes,* 872 S.W.2d at 702-703 (no duty to disclose evidence claimed by defendant to show bias of opposing witness if evidence has no legitimate tendency to show that bias); *State v. Moore,* 240 S.W.3d 324, 328 (Tex. App.  Austin 2007, pet. ref'd); *Galvan v. State,* 129 Tex. Crim. 349, 86 S.W.2d 228, 229-30 (App. 1935)(evidence offered by party to show bias of opposing witness should be excluded if that evidence has no legitimate tendency to show bias of opposing witness).   Therefore, the prosecutor had no duty to disclose it to Parras. *Lagrone v. State,* 942 S.W.2d 602, 615 (Tex. Crim. App. 1997)(prosecution has no duty to turn over evidence that would be inadmissible at trial); *Iness v. State,* 606 S.W.2d 306, 310 (Tex. Crim. App. 1980).

3.     There is no reasonable probability that the result at trial would have been different if the offense report had been disclosed to the defense.   *Wood v. Bartholomew,* 516 U.S. 1, 5 (1995)(per curiam).

*Ex parte Arceneaux,* Application No. 71,053-01 at 306.

There is no evidence to contradict the state court's determination that *Brady* was not violated. *Little v. Johnson,* 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied,* 526 U.S. 1118 (1999).  The state habeas court's rejection on the merits of Arceneaux's *Brady* claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in Arceneaux's state habeas corpus proceedings.

Arceneaux is not entitled to federal habeas corpus relief on this claim.

**B.     Kedric Riley**

Arceneaux next asserts that the prosecution portrayed Riley as a long-time employee of a company, who was receiving treatment for a drug problem. (Reporter's Record, Vol. V, pp. 21-23). It suggested that he "got high" as a result of Wimbley's death, resulting in a motion to adjudicate guilt. Arceneaux argues that three motions to adjudicate guilt were filed in the two and one-half years

before the shooting, and it would appear that he was "high" the entire time he was on probation.  Had

the prosecution disclosed that Riley confessed to the police that he carried a handgun, and that his

prosecutor recommended five years in prison before she knew that he was a prosecution witness,

Parras would have elicited this evidence and argued that Riley had a motive to testify favorably to

avoid incarceration.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Kedric Riley testified on direct examination that he was on six years probation for aggravated assault on a public servant; that a motion to adjudicate guilt was filed after he became a prosecution witness against Arceneaux; that the court sent him to a substance abuse treatment center because he tested positive for drugs; and that he had not been promised anything in exchange for his testimony. I elicited on cross-examination that the State had dismissed a charge of carrying a weapon that was filed in February of 2004. I had no information that the favorable treatment he received on the weapon case and the motion to adjudicate guilt was related to his status as a prosecution witness. The State did not disclose to me that Riley told the police at the time of his arrest that he knew there was a pistol in his car or that the felony prosecutor wrote on the cover of the State's file, "Five years TDCJ no less," before she knew that he was a prosecution witness in a murder case. Had the State disclosed this information, I would have elicited it and argued that it was reasonable to infer that the State dismissed the pistol case and chose not to ask the court to adjudicate his guilt in the aggravated assault case because he was a witness against Arceneaux.

*Ex parte Arceneaux,* Application No. 71,053-01 at 41-43.

The following exchange took place before trial:

> THE COURT:  All right.  State's filed a motion in limine with regard to a witness named --
>
> MS. JOHNSON:  Leundre Prescott.
>
> THE COURT:  Are we talking about his criminal history?

MS. JOHNSON:  No.  You said the State filed a motion in limine.

THE COURT:  No just trying to get to the point of discussion.  All right.  We've got a witness named.

MS. JOHNSON:  Riley.

THE COURT:  Who is on deferred for assault on a public servant and has been on since 1998.

MS. JOHNSON:  That's correct.

THE COURT:  And you don't want the Defense to say that he's on deferred and Mr. Parras what do you want to say about this?

MR. PARRAS:  It's my understanding from the State's -- from admissions that the first motion to adjudicate was filed in May of 03 and was dismissed prior to the incident of this case Judge.  That happened in this case.  However, and that at the time that the witness gave a statement in this case that he was not under a motion to adjudicate or any such motion. Subsequent however to him giving a statement another motion to adjudicate was filed on him, a second one. That one was dismissed as well and the conditions of his probation were amended in May of 03 or actually we don't know when that motion to adjudicate was filed.  We do know that it was dismissed and he was sent to rehabilitation in August of 04. What I'd like to do Judge is to discuss with this witness any evidence of motive or bias so that the jury can decide whether or not his testimony here is influenced at all or to any degree by his interaction with the State on his other case.

MS. JOHNSON:  Your Honor, my response is at no time have I even discussed his probation or deferred adjudication he's currently on. I've never promised him anything if he testifies on behalf of the State nor has any police officer or any agent of the State have they ever communicated anything about his deferred.   He's given the statements on his own freewill. He gave a statement one to two days after the offense of date of October 4, 2003.  I think he spoke to the police either the next day or on the 6th. There was not a motion to adjudicate pending at that time.   He's currently in a drug rehab facility so I don't want any mention of the deferred or that he's currently on probation.

MR. PARRAS:  Just briefly Judge this man has depended on the State for where he sleeps, what he eats, when they can bring him to Harris County to be here for trial.  He's dependent on them for almost every aspect of his daily life right now.  You know two chances at the apple on deferred adjudication is rare and I know it happens Judge but the jury is entitled to make that decision.

THE COURT:  I just really do not care to perpetrate or perpetuate an urban legion[sic] in respect to probation.  I will not sit by and listen to you say that.

MR. PARRAS:  I understand in this court it's not true and in other courts.  However juries are entitled to decide for themselves and listen to the circumstances of his conditions right now and if he denies them he denies them.

THE COURT:  I'm denying your motion in limine.  He can say that the guy is on deferred and you can explore the fact that there was no motion pending or anything like that but I think he's entitled to bring it up at trial.

MS. JOHNSON:  But not to bring up any motions to adjudicate or where he currently resides.

HE COURT:  Well, no I think where he currently resides is important information for anything and the fact that there were no motions on file at the time that he gave his statements you can bring that up.  I don't know that he would want to.

MS. JOHNSON:  Okay.

(Reporter's Record, Vol. III, pp. 3-6).

Kelli Johnson submitted an affidavit to the state habeas court in which she testified:

With respect to Kedric Riley, Mr. Parras was well aware that Mr. Riley was on felony deferred probation for assault of a police officer and that he had been charged with the misdemeanor offense of carrying a weapon. I filed written notice of these cases and included the cause numbers. I never offered Mr. Riley any consideration for his testimony in the primary case. I never told him that his probation or his misdemeanor carrying a weapon charge would be affected in any way by his testimony or assistance to the State. I never asked another

> prosecutor or judge to treat Mr. Riley favorably, nor did I represent
> to Mr. Riley that I would do so. I never asked that any of his motions
> to adjudicate be dismissed or overruled, nor did I ever ask that his
> carrying a weapon case be dismissed. I do not know why the
> misdemeanor prosecutors dismissed the carrying a weapon case.

*Ex parte Arceneaux,* Application No. 71,053-01 at 269.

Denise Nassar Bradley submitted an affidavit to the state habeas court in which she testified:

> With respect to Kedric Riley, Mr. Parras was well aware that Mr.
> Riley was on felony deferred probation for assault of a police officer
> and that he had been charged with the misdemeanor offense of
> carrying a weapon. Written notice of these cases was filed before
> trial, including the cause numbers. I never offered Mr. Riley any
> consideration for his testimony in the primary case. I never told him
> that his probation or his misdemeanor carrying a weapon charge
> would be affected in any way by his testimony or assistance to the
> State. I never asked another prosecutor or judge to treat Mr. Riley
> favorably, nor did I represent to Mr. Riley that I would do so. I never
> asked that any of his motions to adjudicate be dismissed or overruled,
> nor did I ever ask that his carrying a weapon case be dismissed. I do
> not know why the misdemeanor prosecutors dismissed the carrying
> a weapon case.

*Ex parte Arceneaux,* Application No. 71,053-01 at 263.

The state habeas court made the following findings of fact:

> 9. Prosecution witness Kedric Riley was placed on deferred
> adjudication on January 15, 1998, in the 339th District Court for
> assault on a public servant. Between March 2000 and February 2004,
> the State filed four motions to adjudicate guilt alleging various
> technical violations of probation such as repeated drug use, failure to
> perform community service, and failure to pay fine and fees. The
> fourth motion included an allegation that Riley had committed the
> misdemeanor of carrying a weapon. The district court overruled each
> motion in favor of rehabilitation efforts.
>
> 10. Therese Buess was the chief prosecutor in the 339th District
> Court and represented the State of Texas in connection with the third

and fourth motions to adjudicate Riley's guilt. They were filed October 16, 2002, and February 13, 2004.

11. The actions of the 339th District Court on the motions to adjudicate Riley guilty were in keeping with its usual practice and unflagging efforts to rehabilitate its probationers.

12. Neither Buess nor anyone under her supervision recommended that Riley's weapon case be dismissed. Buess does not know why it was dismissed.

13. Neither Johnson nor Bradley promised, sought or gave Riley any consideration in exchange for his testimony at trial in the primary case. They do not know why the weapon case was dismissed.

14. Parras knew at the time of trial that Riley was on deferred adjudication for assault on a police officer and that he had been charged with carrying a weapon. Parras cross-examined Riley to show that Riley was on probation, was subject to a motion to adjudicate his guilt, and had his weapon case dismissed while he was acting as a State witness. Parras argued in closing that Riley was under the State's control and therefore motivated and biased to testify favorably for the State.

15. The alleged exculpatory facts -- that Riley's fourth Motion to Adjudicate was overruled despite the prosecutor's recommendation of five years' confinement and that Riley's weapon charge was dismissed -- do not show that Riley had a motive to testify favorably for the State.

*Ex parte Arceneaux,* Application No. 71,053-01 at 300-301. The Texas Court of Criminal Appeals expressly based its denial of habeas relief on these findings. *Ex parte Arceneaux,* Application No. 71,053-01 at cover.

This court must accept as correct any factual determinations made by the state courts unless Arceneaux rebuts the presumption of correctness by clear and convincing evidence. Arceneaux has failed to rebut the presumption of correctness.

The state habeas court made the following conclusions of law:

4.      The overruling of Riley's fourth motion to adjudicate and the dismissal of his weapon charge do not constitute favorable, material evidence. *Lagrone,* 942 S.W.2d at 615; *Ex parte Kimes,* 872 S.W2d at 703; *Iness,* 606 S.W.2d at 310.

5.      There is no reasonable probability that, had the alleged exculpatory facts been disclosed, the result at trial would have been different. *Wood,* 516 U.S. at 5.

*Ex parte Arceneaux,* Application No. 71,053-01 at 306-307.

There is no evidence to contradict the state court that *Brady* was not violated. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999). In *Wood v. Bartholomew,* 516 U.S. 1 (1995), the Supreme Court considered whether the failure to disclose inadmissible evidence constituted a *Brady* violation. The Court concluded that speculation about the effect of evidence inadmissible under state law – polygraph results – was insufficient to show a *Brady* violation. "It is difficult to see, then, on what basis . . . respondent's counsel would have prepared in a different manner, or (more important) would have discovered some unspecified additional evidence, merely by disclosure of polygraph results . . . In short, it is not 'reasonably likely' that disclosure of the polygraph results – inadmissible under state law – would have resulted in a different outcome at trial. . ." *Wood,* 516 U.S. at 6-8.

In the present case, Arceneaux complains that the prosecutor failed to disclose evidence concerning an ongoing criminal investigation against State's witness, Ron Green. He further complains that the State failed to disclose that Kedrick Riley, another State's witness, had a motive to testify favorably to avoid incarceration. It is not "reasonably likely" that disclosure of the mentioned evidence would have affected the outcome. The case against Arceneaux was overwhelming. To acquit Arceneaux of murder, the jury would have had to believe that Arceneaux

did not knowingly cause the death of Terrence Wimbley by shooting him with a firearm. *Ex parte Arceneaux*, Application No. 71,053-01 at 327.  As described in the detailed summary of the trial testimony, the jury heard the testimony about Arceneaux's demeanor and actions on the night of the offense.  State witnesses testified that Arceneaux walked down the middle of the driveway directly toward Wimbley though Arceneaux could have approached his car on a different path.  Arceneaux fired his gun as Wimbley was running away from Arceneaux.  Arceneaux "skipped" or "trotted" to the end of the driveway and shot Wimbley two more times as he lay facedown on the street.  The State presented ample physical evidence showing that Arceneaux shot Wimbley.  The medical examiner testified that Wimbley had three gunshot wounds, and the one to his face was fatal.  The undisclosed evidence was not material because there was not a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

In the face of the evidence, more than supposition on the weak premises offered by Arceneaux is needed to undermine confidence in the outcome.  As the Court stated in *Wood*:

> Whenever a federal court grants habeas relief to a state prisoner the issuance of the writ exacts great costs to the State's legitimate interest in finality.  And where, as here, retrial would occur 13 years later, those costs and burdens are compounded many times.  Those costs may be justified where serious doubts about the reliability of a trial infested with constitutional error exist.  But where, as in this case, a federal appellate court, second-guessing a convict's own trial counsel, grants habeas relief on the basis of little more than speculation with slight support, the proper delicate balance between the federal courts and the States is upset to a degree that requires correction.

*Wood*, 516 U.S. at 8.

The state habeas court's rejection on the merits of Arceneaux's *Brady* claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in Arceneaux's state habeas corpus proceedings.

Arceneaux is not entitled to federal habeas corpus relief on this claim.

## V.     The Claim of Ineffective Assistance of Trial Counsel

To establish an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that he was actually prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 68 (1984). Whether counsel's performance was deficient is determined by an objective standard of reasonableness. *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999). "[S]crutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91; *see also United States v. Jones*, 287 F.3d 325, 331 (5th Cir.)("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."), *cert. denied*, 537 U.S. 1018 (2002); *Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (*Strickland* requires deference to counsel's "informed strategic choices"). "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Jones*, 287 F.3d at 331. To overcome the deference given to

informed strategic decisions, a petitioner must show that his counsel "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client." *Id.*; *see also Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999) ("*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose.").

Even if a petitioner establishes that his counsel's performance was deficient, he must also establish that "prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different." *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997). A petitioner must show that the prejudice made the trial outcome "fundamentally unfair or unreliable." *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364 (1993)).

The state habeas court found that:

> 7.     Applicant fails to show that Parras' conduct fell below an objective standard of reasonableness. There is no reasonable probability that the results of the proceeding would have been different but for Parras' conduct. *Strickland v. Washington,* 466 U.S. 668, 686 (1984); *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting the *Strickland* standard in Texas); and *Narvaiz v. State,* 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (defining the two-part *Strickland* standard).
>
> . . .
>
> 20.     The totality of the representation afforded applicant at trial and on direct appeal was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Ex parte Arceneaux,* Application No. 71,053-01 at 307, 309.

Under AEDPA, this court must give proper deference to the state court's determination that trial counsel rendered effective assistance. *See Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002).

Because the state court properly identified *Strickland* as the governing legal principle, the "unreasonable application" prong of section 2254(d)(1) provides the standard that governs this court's review of the state court's decision on Arceneaux's ineffective counsel claims. *Bell v. Cone*, 535 U.S. 685, 694-695 (2002).  This court  must determine whether the state court's application of *Strickland* was objectively unreasonable.  *Id.*; *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1104 (2003).  Under section 2254(d)(1), "[w]e have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of *Strickland* is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (quoting *Neal*, 286 F.3d at 236).  "The federal-habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).  Arceneaux complains that trial counsel, Parras, rendered ineffective assistance in three respects.  The court addresses each below.

### A.    Failure to Make Objections

Arceneaux complains that counsel failed to object to references to the "murder scene" and "murder weapon."  Arceneaux notes that HPD homicide investigator Steven Straughter testified without objection that, when he arrived at the residence, he saw a "murder scene." (Reporter's Record, Vol. V, p. 129).  He further notes that the prosecutor referred to the "murder scene" and "murder weapon" without objection while cross-examining Arceneaux. (Reporter's Record, Vol. VI, pp. 192-93). Arceneaux  complains that Parras's failure to object to the references to the "murder scene" and "murder weapon" undermined Arceneaux's testimony that he acted in self-defense.

Arceneaux insists that no sound strategy could justify the failure to object, and Parras did not offer a strategic reason.

As noted previously, trial counsel prepared an affidavit concerning his representation of Arceneaux at the request of habeas counsel, Randy Schaffer.  In his affidavit to the state habeas court, Parras testified:

> I did not object when a homicide investigator twice referred to the "murder scene" on direct examination and when the prosecutor referred to the "murder scene" and "murder weapon" while questioning Arceneaux. I did not consider filing a motion in limine to preclude the prosecution and its witnesses from referring to the "murder scene" and "murder weapon." My failure to file a motion in limine and to object when these references were made was inadvertent rather than strategic.

*Ex parte Arceneaux,* Application No. 71,053-01 at 44.

Arceneaux first complains that Officer Straughter used the term "murder," and counsel failed to object.  The record shows that Officer Straughter was the lead investigator, and his testimony is transcribed over more than forty-five pages.  Officer Straughter testified about his actions upon arriving at the crime scene.  He described the evidence that was recovered and its location at the scene.  He testified that crime scene investigators recovered two cell phones, a knife, shell casings, and bullets from the scene.  Officer Straughter explained that in some neighborhoods, witnesses are unwilling to cooperate with the police.  He testified that witnesses were initially unwilling to speak with the police on the night of the offense, but they later came forward and made statements.  Based on the witnesses' statements and the physical evidence, Officer Straughter obtained an arrest warrant for Arceneaux on murder charges.  (Reporter's Record, Vol. V, pp. 125-171).

Arceneaux also complains that the prosecutor improperly used the term "murder," and counsel failed to object. The prosecutor used the term "murder" in the following exchange during cross-examination of Arceneaux:

> Q. What did you do with the gun after you got in your car?
>
> A. I threw it away.
>
> Q. Where did you throw it?
>
> A. I threw it in a ditch.
>
> Q. Okay. So on your way driving away from that murder scene where you've gunned somebody down you get rid of the gun?
>
> A. Right.
>
> Q. The murder weapon.
>
> A. Right.
>
> Q. Why did you do that?
>
> A. Because I was nervous.

(Reporter's Record, Vol. VI, pp. 192-93).

The record shows that the State's case-in-chief took place over a period of three days. During that time, the State called thirteen witnesses, and their testimony comprised over 480 pages of transcript. (Reporter's Record, Vol. III, pp. 25-113; Reporter's Record, Vol. IV, pp. 3-112; Reporter's Record, Vol. V, pp. 4-218; Reporter's Record, Vol. VI, pp. 6-82). The prosecutor never argued that Arceneaux had admitted to committing the offense of murder.

Though counsel claims that the decision not to object to the use of the word "murder" was inadvertent rather than strategic, the record shows that counsel pursued a very clear strategy of

showing that Arceneaux acted in self-defense.  The trial transcript reflects that Arceneaux's counsel subjected the state's case to meaningful adversarial testing while carefully questioning the state's witnesses.  He was intimately familiar with the facts, the crime scene, and the statements made by the various witnesses.  He went to great lengths to point out the inconsistencies in the witnesses' testimony.  He also argued that Arceneaux had acted in self-defense after Wimbley came toward him with a knife.  The State presented witnesses who testified that they saw Arceneaux fire on Wimbley as Wimbley ran away, and fired two more shots after following Wimbley into the street.

Counsel argued that Arceneaux acted in self-defense in spite of the unfavorable facts and the overwhelming evidence of Arceneaux's guilt.  It is undisputed that Arceneaux agreed with counsel's proposed strategy.  Presumably, Arceneaux and counsel made a calculated decision for Arceneaux to take the stand to explain that he shot Wimbley in self-defense.  Arceneaux does not suggest what else his counsel could have done on his behalf.

Arceneaux does not state the basis on which counsel could have objected to the term "murder."  Moreover, objecting to the term "murder" would have been futile, given that Arceneaux was on trial for murder.  (Clerk's Record, Vol. I, p. 6).   Counsel cannot be deficient for failing to press a frivolous point.  *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *Green v. Johnson,* 160 F.3d 1029, 1036-37 (5th Cir. 1998), *cert. denied,* 525 U.S. 1174 (1999)(citing *Sones v. Hargett,* 61 F.3d 410, 415 (5th Cir. 1995)).

Even if inadvertent, the record suggests that Parras's decision not to object to the use of the term "murder" was a strategic decision.  Strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of federal habeas review. *See Strickland,* 466 U.S. at 689 (emphasizing that "Judicial scrutiny of counsel's performance must be highly

deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight").

A federal habeas corpus court may not find ineffective assistance of counsel merely because it disagrees with counsel's chosen trial strategy. *Crane v. Johnson,* 178 F.3d 309, 312 (5th Cir. 1999). It is well established in this circuit that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson,* 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle,* 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio,* 669 F.2d 1075 (5th Cir. 1982)).

The state habeas court found:

> 21. HPD homicide investigator Steven Straughter testified on direct examination at trial that he was involved with the scene investigation on the night of the shooting, and when he arrived, he saw "a murder scene. It was taped off with the yellow police tape and . . . the complainant Terrence Wimbley [was] deceased in the middle of the street."

> 22. Straughter's testimony comprised over forty-two pages in which he described his scene investigation, the evidence collected, his subsequent witness interviews and his eventual role in obtaining a warrant for applicant's arrest. The prosecutor never mentioned Straughter's use of term "murder scene," nor was it referenced in closing argument.

> 23. Straughter's isolated use of the phrase "murder scene" was unremarkable and had no effect on the jury's verdict.

> 24. The prosecutor cross-examined applicant about his version of the events occurring just before he shot the complainant and immediately thereafter when applicant fled the scene and used the phrases "murder scene" and "murder weapon" once each.

> 25. The prosecutor did not claim applicant's affirmative responses to her use of the phrases "murder scene" and "murder weapon"

constituted any type of admission, nor did she rely on these responses in her closing argument.

26. The prosecutor's isolated use of the phrases "murder scene" and "murder weapon" was unremarkable and had no effect on the jury's verdict.

*Ex parte Arceneaux,* Application No. 71,053-01 at 302-303.

The state habeas court made the following conclusions of law:

8. Parras' failure to object to Straughter's isolated use of the phrase "murder scene" did not fall below an objective standard of reasonableness.

9. Parras' failure to object to the prosecutor's use of the phrases "murder weapon" and "murder scene" did not fall below an objective standard of reasonableness.

10. Parras' failure to object to the isolated use of the phrases "murder scene" and "murder weapon" did not amount to a concession before the jury that an offense was committed.

11. There is no reasonable probability that, but for Parras' failure to object, the result of the proceeding would have been different. *Strickland* 466 U.S. at 686.

*Ex parte Arceneaux,* Application No. 71,053-01 at 307.

The state habeas court's rejection on the merits of Arceneaux's ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in Arceneaux's state habeas corpus proceedings.

Arceneaux is not entitled to federal habeas corpus relief on this claim.

### B.    Improper Reference to the Deceased as the "Victim"

Arceneaux next complains that Parras repeatedly referred to Wimbley as the "victim" while questioning the firearms examiner and the medical examiner ( Reporter's Record, Vol. V, pp. 199, 205, 206, 209, 217; Reporter's Record, Vol. VI, p. 67).  He acknowledged that this was a poor word choice, as the term "victim" undermined Arceneaux's testimony that he acted in self-defense. Arceneaux complains that  Parras's repeated references to Wimbley as the "victim" were at odds with Arceneaux's testimony, as no crime was committed if he acted in self-defense.  No sound strategy could justify his word choice, and Parras did not offer a strategic reason.

In his affidavit to the state habeas court, Parras testified:

> I repeatedly referred to the deceased as the "victim" while questioning the firearms examiner and the medical examiner. In retrospect, this was a poor word choice, as my references to the "victim" were inconsistent with Arceneaux's testimony that he acted in self-defense. In retrospect, I should not have referred to the deceased as the "victim."

*Ex parte Arceneaux,* Application No. 71,053-01 at 44.

The state habeas court found:

> 27. Parras cross-examined firearms examiner Kim Downs and medical examiner Dr. Dwayne Wolf over the course of thirty-four pages and used the word "victim" on several occasions in the context of the complainant as a "shooting victim." Parras' use of the term "victim" was in the context of a hypothetical or clinical question, did not invoke the substantive definition of "victim" or its application to applicant's guilt for murder, and had no bearing on applicant's guilt and the evidence relating to whether the shooting was justified.
>
> 28. The State did not rely in closing argument on Parras' use of the word "victim" or emphasize it anywhere else in trial.
>
> 29. Parras' use of the word "victim" was unremarkable and had no effect on the jury's verdict.

*Ex parte Arceneaux,* Application No. 71,053-01 at 303-304.

The state habeas court made the following conclusion of law:

> 12. Parras' use of the word "victim" during his cross-examination of the firearms and medical examiners did not fall below an objective standard of reasonableness.   There is no reasonable probability that the result of the proceeding would have been different but for his use of that word. *Strickland* 466 U.S. at 686.

*Ex parte Arceneaux,* Application No. 71,053-01 at 308.

The state habeas court's rejection on the merits of Arceneaux's ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in Arceneaux's state habeas corpus proceedings.

Arceneaux is not entitled to federal habeas corpus relief on this claim.

### C.    Improper Questioning

Parras elicited on direct examination that Arceneaux completed a class to obtain a concealed handgun license but did not receive it because he did not pay the fee. (Reporter's Record, Vol. VI, p. 211).  The prosecutor asked on cross-examination whether Arceneaux knew that people with "felony probations or criminal convictions or priors" are not entitled to a concealed handgun license; he responded (incorrectly) that he was entitled to it despite a successfully completed felony deferred adjudication probation. (Reporter's Record, Vol. VI, p. 217).  The court instructed the jury that the deferred adjudication probation was admissible but could not be considered as evidence of guilt. (Clerk's Record, p. 109).

In his affidavit to the state habeas court, counsel testified:

I elicited from Arceneaux on direct examination that he completed a
class to obtain a concealed handgun license but did not receive it
because he did not pay the fee. The prosecutor asked on cross-
examination whether Arceneaux knew that people with "felony
probations or criminal convictions or priors" are not entitled to a
concealed handgun license; he responded (incorrectly) that he was
entitled to one despite a successfully completed felony deferred
adjudication probation. I asked Arceneaux about taking this class to
demonstrate that he had been educated in the use of deadly force to
defend himself, even though my question opened the door for the
prosecutor to elicit the otherwise inadmissible felony deferred
adjudication probation. I did not consider asking whether he had
taken classes on the use of deadly force to defend himself without
eliciting that he did so to obtain a concealed handgun license; this
question would not have opened the door to evidence of his felony
deferred adjudication probation.

*Ex parte Arceneaux*, Application No. 71,053-01 at 44-45.

The state habeas court found:

30. Parras questioned applicant on direct examination about
completing a class to obtain a concealed handgun license because he
wanted to demonstrate that applicant had been educated in the use of
deadly force as self defense.

31. The prosecutor later cross-examined applicant about why he never
got the license, eliciting testimony from applicant that he incorrectly
believed he was entitled to get a concealed handgun license even
though he had a previous deferred adjudication probation.

32. Parras argued in closing that the complainant was not innocent,
the complainant attacked applicant, and if applicant had not had a gun
to defend himself, then the complainant would have been facing
criminal charges, and the State would have had a different argument.

33. Parras' strategic decision to question applicant about completing
the concealed handgun license class and carrying a gun to defend
himself was reasonable and had a plausible basis.

34. The prosecution did not question applicant further about why he
did not get the handgun license, nor did she question applicant any
further about the nature of the felony offense for which he was on

probation. The prosecutor never mentioned applicant's felony probation in closing argument.

*Ex parte Arceneaux,* Application No. 71,053-01 at 304.

The state habeas court made the following conclusions of law:

> 13. Parras' questioning of applicant about his completion of a class to obtain a concealed handgun license was reasonable trial strategy and had a plausible basis. *Ex parte Ewing,* 570 S.W.2d 941 (Tex. Crim. App. 1978)(trial strategy will be reviewed only if record shows that action was without plausible basis).
>
> 14. Applicant fails to show that he was harmed by Parras' conduct. *Resendiz v. State,* 112 S.W.3d 541, 546 (Tex. Crim. App. 2003)(jury is presumed to have acted rationally and to have followed the trial court's instructions); *Richardson v. State,* 879 S.W.2d 874, 882 (Tex. Crim. App. 1993).

*Ex parte Arceneaux,* Application No. 71,053-01 at 308.

Second-guessing is not the test for ineffective assistance of counsel. *King v. Lynaugh,* 868 F.2d 1400, 1405 (5th Cir. 1989). In *Strickland,* 466 U.S. at 691, the Supreme Court explained that:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

*Id.* at 691.

Arceneaux seeks to blame his attorney for his conviction and sentence of imprisonment. As the Fifth Circuit has recognized, "the tendency, when all else fails, [is] to blame the lawyer." *United States v. Faubion,* 19 F.3d 226, 232 (5th Cir. 1994).

Arceneaux cannot meet his burden under AEDPA. "In any ineffectiveness case, a particular decision by counsel must be directly assessed for reasonableness in all the circumstances, applying

a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691. Under AEDPA, this court reviews with deference "the ultimate legal conclusion that the state court reached." *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002). Without "the distorting effects of hindsight," *Strickland,* 466 U.S. at 689, the state court found that trial counsel rendered effective assistance. Accordingly, viewed through AEDPA's deferential lens, the state court's rulings regarding trial counsel's decisions not to object to the term "murder", not to object to the term "victim," and to question Arceneaux about his handgun license, were not contrary to or an unreasonable application of *Strickland. See* § 2254(d)(1).

The state habeas court's rejection on the merits of Arceneaux's ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in Arceneaux's state habeas corpus proceedings.

Arceneaux is not entitled to federal habeas corpus relief on this claim.

## VI.    The Claim Based on Ineffective Assistance of Appellate Counsel

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Williams v. Collins,* 16 F.3d 626, 635 (5th Cir. 1994). Arceneaux argues that Wimbley placed his jewelry, the contents of his pockets, and his cell phone in his car because he wanted to fight Arceneaux. (Reporter's Record, Vol. IV, pp. 38, 75). When the opportunity arose, he "sucker-punched" Arceneaux. (Reporter's Record, Vol. V, pp. 32, 67). During a brawl, Arceneaux pulled a gun and shot Wimbley. (Reporter's Record, Vol. III, pp. 89-91). Arceneaux testified that he became angry when Wimbley punched him. (Reporter's Record, Vol. VI, p. 162).

Arceneaux explains that the court submitted a special issue at the punishment stage asking whether the jury found by a preponderance of the evidence that Arceneaux caused Wimbley's death under the immediate influence of sudden passion arising out of an adequate cause.    The jury answered in the negative. (Clerk's Record, pp. 116-17, 123). Arceneaux faults appellate counsel for failing to argue that the evidence was factually insufficient to support the jury's answer to the special issue.   Arceneaux asserts that if the jury had found by a preponderance of the evidence at the punishment stage of a murder trial that the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause, the offense would have been a second-degree felony instead of a first-degree felony. TEX. PENAL CODE ANN. § 19.02(d).  Arceneaux argues that the evidence was uncontradicted that Wimbley attacked Arceneaux and initiated a brawl and that Arceneaux became angry and shot him.   Arceneaux maintains that Wimbley's conduct constituted sufficient provocation to meet the definition of "sudden passion." Arceneaux argues that reasonably competent counsel would have raised this issue on appeal.   Arceneaux further claims that the state habeas court used an incorrect standard of review.   The issue is whether there is a reasonable probability that an appellate court, after viewing all of the evidence in a neutral light, would have held that the jury's negative answer to the special issue was against the great weight and preponderance of the evidence.

To the extent Arceneaux complains that the state habeas court applied the wrong standard of review, the infirmities in state habeas proceedings on habeas review that Arceneaux alleges do not constitute grounds for habeas relief in federal court. *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir. 1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1080 (5th Cir.), *cert. denied,* 118 S. Ct. 576 (1997); *see Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir. 1995)("An attack on a state habeas proceeding

does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself."); *Morris v. Cain,* 186 F.3d 581, 585 n.6 (5th Cir. 1999). Arceneaux has not asserted an error in the state habeas proceeding affecting the deference due the state courts' findings in the habeas proceedings. Arceneaux has not shown a basis for granting habeas relief.

Alternatively, the court finds that, to the extent Arceneaux asks this court to review the state court's application of state law, his claims are outside the scope of federal habeas review. *Nobles v. Johnson,* 127 F.3d 409, 419 (5th Cir. 1997) (citing *Pemberton v. Collins,* 991 F.2d 1218, 1223 (5th Cir. 1993)). This court considers factual sufficiency of the evidence concerning sudden passion under Texas law only in the context of Arceneaux's Sixth Amendment ineffective assistance of appellate counsel claim (i.e., to demonstrate that Arceneaux suffered no prejudice from his counsel's alleged error).

Arceneaux contends the jury's negative finding on the issue of whether he acted under the influence of sudden passion arising from adequate cause was so against the great weight and preponderance of the evidence as to be manifestly unjust. Arceneaux argues that Wimbley repeatedly came toward him with a knife and immediately before this incident, Wimbley had "sucker punched" Arceneaux in the head. These circumstances represented sufficient provocation to produce a degree of terror that rendered him incapable of cool reflection.

An appellate court may review the legal sufficiency of the evidence to support a fact finder's rejection of an issue on which the defendant bore the burden of proof, i.e., affirmative defenses and the issue of sudden passion. *See Clark v. State,* 190 S.W.3d 59, 62 (Tex. App. - Amarillo 2005, no pet.); *Cleveland v. State,* 177 S.W.3d 374, 388 (Tex. App. - Houston [1st Dist.] 2005, pet. ref'd) (en

banc), *cert. denied,* 547 U.S. 1073 (2006); *Ballard v. State,* 161 S.W.3d 269, 272 (Tex. App. -
Texarkana 2005), *aff'd,* 193 S.W.3d 916 (Tex. Crim. App. 2006).

When conducting a factual sufficiency review on an affirmative defense or issue on which
the defendant had the burden of proof, an appellate court reviews all of the evidence in a neutral
light, but this court does not intrude on the fact finder's role as the sole judge of the weight and
credibility given to any witness's testimony. *See Clark,* 190 S.W.3d at 63; *Cleveland,* 177 S.W.3d
at 390-91; *Wheat,* 165 S.W.3d at 807 n.6.   When a defendant has asserted such an affirmative
defense or issue, an appellate court considers all of the evidence and determines whether the
judgment rendered is so against the great weight and preponderance of the evidence as to be
manifestly unjust. *See Edwards v. State,* 106 S.W.3d 833, 843 (Tex. App. - Dallas 2003, pet. ref'd)
(citing *Clewis v. State,* 922 S.W.2d 126, 132 (Tex. Crim. App. 1996)); *Cleveland,* 177 S.W.3d at
390; *Ballard,* 161 S.W.3d at 271. When an appellate court concludes the contrary evidence is
insufficient to support rejection of defendant's affirmative defense or issue, it must clearly state why
the verdict is so against the great weight and preponderance of the evidence as to be manifestly
unjust, why it shocks the conscience, or why it clearly demonstrates bias. *See Meraz,* 785 S.W.2d
at 154 n.2; *Howard,* 145 S.W.3d at 335.   The fact-finder alone determines the weight to be given
contradictory testimonial evidence because that determination depends on the fact-finder's evaluation
of the credibility and demeanor. *Cain v. State,* 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997).  As
the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or
none of the testimony presented. *Id.* at 407 n.5.

At trial, Arceneaux testified that, when he walked down the driveway to his car, Wimbley
stepped out and held his arms open wide, holding a knife in his left hand. Arceneaux walked past,

and Wimbley punched Arceneaux in the back of the head. Arceneaux stumbled forward and fell "right by the grass." When he turned over, Wimbley was standing over him and took a swing at Arceneaux. Arceneaux threw his hands up, and Wimbley cut him on his right pinky finger. Wimbley was "still coming" at him with a knife, so he threw his legs up and was cut on the leg. Photographs and medical records show these cuts, and Arceneaux stated that, when he went to the hospital two days later, it was too late to get stitches in his leg. Arceneaux said he felt like his life was in danger. He reached for his gun and fired it once or twice toward Wimbley, who, once he noticed Arceneaux had a gun, started running between the cars. Arceneaux believed Wimbley was running toward his car, where Arceneaux had seen him put his gun earlier. Arceneaux got up from the ground and started toward his truck, but fell and scraped his knee. When he fell, Arceneaux looked to his right and saw Wimbley. Arceneaux believed Wimbley had made it to his car to retrieve his gun. Arceneaux fired one or two more shots in Wimbley's direction from Arceneaux's position right in front of his Expedition. Arceneaux testified he never walked to where Wimbley fell; instead, he backed up and ran to his truck. Despite Arceneaux's testimony that his stab wounds were bleeding, his blood was not found on the scene.

Witnesses for the prosecution testified that Arceneaux fired on Wimbley as Wimbley ran away, and fired two more shots after following Wimbley into the street. Wimbley was, in fact, shot twice from behind. The jury, as the finder of fact, was free to disbelieve Arceneaux's testimony. Nothing in the record clearly reveals a different result is appropriate, and this court must defer to the jury's determination about what weight should be placed upon each witness' testimony. Viewing all evidence in a neutral light, this court finds the jury was rationally justified in finding that Arceneaux had not acted in influence of sudden passion arising out of an adequate cause.

The jury had previously rejected Arceneaux's self-defense argument during the guilt/innocence phase of trial.  The jury again rejected the "sudden passion" argument in the punishment phase of trial.  Appellate counsel made a tactical decision not to challenge the factual sufficiency of the jury's answer to the special issue.

Appellate counsel cannot be found ineffective for having failed to raise this ground, and prejudice cannot have resulted from counsel's failure to assert a meritless claim or make a meritless argument. *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994).  Failure to raise meritless objections or grounds for appeal "is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).  Arceneaux cannot demonstrate prejudice because he has not identified any meritorious claims upon which he was likely to prevail on appeal, and he is therefore not entitled to relief on this claim. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) (holding the performance component need not be addressed first).  Arceneaux's claim therefore does not warrant habeas relief.

The state habeas court found:

> 39. The jury charge at the punishment stage of trial included a special issue asking whether the jury found by a preponderance of the evidence that applicant caused the complainant's death under the immediate influence of sudden passion arising out of an adequate cause. The jury answered in the negative.
>
> 40. The jury's rejection of applicant's claim of sudden passion was not so manifestly unjust as to "shock the conscience" or "clearly demonstrate bias."

*Ex parte Arceneaux,* Application No. 71,053-01 at 305.

The state habeas court made the following conclusions of law:

17. The jury's rejection of applicant's claim of sudden passion was not so manifestly unjust as to "shock the conscience" or "clearly demonstrate bias." *Jones v. State,* 944 S.W.2d 642, 648 (Tex. Crim. App. 1996).

18. Applicant fails to show that appellate counsel's decision not to challenge the factual sufficiency of the evidence supporting the jury's negative answer to the sudden passion issue fell below professional norms.

19. There is no reasonable probability that the result of the proceeding would have been different if the issue had been raised. *Ex parte Butler,* 884 S.W.2d 782, 783 (Tex. Crim. App. 1994)(applying the two-pronged analysis of *Strickland* to question of whether counsel rendered effective assistance on direct appeal).

20. The totality of the representation afforded applicant at trial and on direct appeal was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Ex parte Arceneaux,* Application No. 71,053-01 at 308-309. The Texas Court of Criminal Appeals expressly based its denial of habeas relief on these findings. *Ex parte Arceneaux,* Application No. 71,053-01 at cover.

Arceneaux fails to rebut the presumed correctness of these findings with clear and convincing evidence. Having independently reviewed the entire state court record, this court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Arceneaux's claim based on ineffective assistance of appellate counsel does not warrant federal habeas relief.

## VII.     Conclusion

Respondent's Motion for Summary Judgment, (Docket Entry No. 6), is GRANTED. Arceneaux's petition for a writ of habeas corpus is DENIED. This case is DISMISSED. Any remaining pending motions are DENIED as moot.

Arceneaux filed the instant Section 2254 application for habeas relief after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). His application is therefore subject to the AEDPA. *ShisInday v. Quarterman*, 511 F.3d 514 (5th Cir. 2007)(citing *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)). Under the AEDPA, a petitioner must obtain a COA before appealing the district court's denial of habeas relief. 28 U.S.C. § 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals ....'" *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 482 (2000); *Hohn v. United States*, 524 U.S. 236, 248 (1998)).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).  Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El*, 123 S. Ct. at 1039.  The court must look to the district court's application of AEDPA to the petitioner's constitutional claims and determine whether the court's resolution was debatable among reasonable jurists. *Id.* "This threshold inquiry does not require full

consideration of the factual or legal bases adduced in support of the claims." *Id.* Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* at 1040 (citing *Slack v. McDaniel,* 529 U.S. 473, 484). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," a certificate of appealability should issue only when the prisoner shows both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Jimenez v. Quarterman,* — U.S. —, 129 S. Ct. 681, 684 n.3 (2009)(quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)); *Beazley v. Johnson,* 242 F.3d 248, 263 (5th Cir. 2001).

A district court may deny a certificate of appealability, *sua sponte,* without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). The court determines that Arceneaux has not made "a substantial showing of the denial of a constitutional right." Therefore, a certificate of appealability from this decision will not issue.

SIGNED at Houston, Texas, on _____ Sept. 20 _____ 2010.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE